TAUBER, ET AL. *v.* COUNTY BOARD OF AP-
PEALS FOR MONTGOMERY COUNTY,
ET AL.

[No. 228, September Term, 1969.]

*Decided March 5, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*James R. Miller, Jr.,* with whom were *Miller, Miller & Canby* on the brief, for appellants.

*Arthur S. Drea, Jr., Assistant County Attorney,* with whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for County Board of Appeals for Montgomery County, part of appellees; and by *William S. Green,* with whom was *David J. Sharpe* on the brief, for Frank V. Cantwell, et al., other appellees.

BARNES, J., delivered the opinion of the Court.

The County Board of Appeals for Montgomery County (the Board), one of the appellees, on May 7, 1968, denied the applications of Laszlo N. Tauber, et al., appellants (applicants or property owners), for a Special Exception and for a Variance for off-street parking on a 2.4145 acre unimproved tract, owned by the applicants. The tract (subject property) is located on Westbard Avenue, generally between River Road and Massachusetts Avenue near Bethesda, Montgomery County, and is in proximity to the Westwood development. This subject property is in an R-60 (single family detached houses and certain institutional and other uses) zone. The principal question before us is whether or not this action by the Board was arbitrary, unreasonable and capricious.

The subject property is the northwesterly half of the

tract which was involved in the case of *Tauber v. Montgomery County Council*, 244 Md. 332, 223 A. 2d 615, decided by us on November 10, 1966. In the earlier *Tauber* case, we affirmed the order of the Circuit Court for Montgomery County denying the petition of the appellants (in that case) to declare null and void as arbitrary, unreasonable and capricious a resolution of the Montgomery County Council, sitting as a District Council, denying the requested change of zone from R-R to R-H (a "floating" high-rise apartment zone). In the resolution of the District Council on October 13, 1964, denying the change to R-H zoning in the earlier *Tauber* case, the following appeared:

> "* * * Moreover, the Council believes that the Board's comments concerning traffic problems in this vicinity are well taken. Although evidence was introduced tending to show that R-H development would have a relatively insignificant impact on traffic, it must be conceded that existing traffic on Massachusetts Avenue, a primary artery to the District of Columbia, and Westbard Avenue is extremely heavy, and that severe congestion is being experienced during rush hours. In these circumstances, the Council preceives no basis whatsoever for any reclassification which would increase the density of development at this intersection to the extent proposed herein."

The subject property in the present case has a 286 foot frontage on Westbard Avenue on the west and approximately a 524 foot boundary on the right of way of the Baltimore and Ohio Railroad to the east. To the north, the subject property borders on Crown Street (a proposed and partially dedicated but unimproved street) for approximately 296 feet, and to the south the property borders on other land owned by the applicants.

Directly across Westbard Avenue from the subject property is a nonvehicular entrance to Western Suburban

Junior High School. Also on Westbard Avenue across from the subject property and south of the junior high school is the Little Falls Library. Included in this school complex and to the west of the library is the Little Flower Church and Parochial School. These facilities have no vehicular access to Westbard Avenue. East of the tracks of the Baltimore and Ohio Railroad Company is a park maintained by the Maryland-National Capital Park and Planning Commission. North of Crown Street is an automobile parking area for the Westwood Building, occupied by the National Institutes of Health (NIH) as well as unimproved property in the I-2 (Heavy Industrial) zone. Across Westbard Avenue from the Westwood Building are the Westwood Shopping Center, the Westwood Apartments and certain off-street parking lots. Across Massachusetts Avenue, on the southeast and southwest corners of the intersection of Massachusetts Avenue and Westbard Avenue (Fort Sumner Drive at that location) are an Episcopal Church and a Lutheran Church, respectively, with their automobile parking lots.

No single family dwellings abut the subject property. There are single family dwellings behind the Episcopal and Lutheran Churches to the south and across the railroad tracks, Little Falls Parkway and the park to the east. The closest single family dwellings to the subject property are apparently those on Brookview Drive, between 500 to 600 feet of the subject property. Two of those who protested the granting of the applications live at 5112 and 5114 Brookview Drive, respectively. They testified that they could see the subject property from their dwellings, and that they believed the granting of the applications would adversely affect the value of their properties. In addition to various protesting improvement associations, there were protestants whose properties were located at 5003, 5005, and 5010 Fort Sumner Road, 5809 Devonshire Drive and 5401 Massachusetts Avenue. There is no challenge in the present case to the standing of the protestants to oppose the granting of the applications.

The applicants proposed to use the subject property, if their applications had been granted, in conjunction with the parking of those who use the Westwood Building, occupied by NIH. If the requested variance for parking (dealing with set-back requirements from the railroad tracks) had been granted together with the granting of the applications for the special exception, the proposed parking lot would contain 279 parking spaces; if the requested variance was not granted but the requested special exception was granted, the parking lot would contain from 254 to 261 parking spaces.

As already indicated, the Board declined to grant the applications. The Board's action was affirmed on appeal to the Circuit Court for Montgomery County. Judge Shure in his written opinion found that the action of the Board was not arbitrary, unreasonable or capricious, and was based upon sufficient evidence to make the issues before it fairly debatable. He passed an order on June 16, 1969, affirming the Board from which order the applicants perfected a timely appeal to this Court. We agree with the decision of the lower court and shall affirm the order of June 16, 1969. We will state additional facts when we later consider the principal question raised before us.

The relevant provisions of the Montgomery County Code (1965), as amended, in regard to zoning, relevant to the present case at the time of the hearings, were as follows:

*Sec. 111-37. Uses which may be permitted; standards and requirements for specific uses.*

"Uses for which special exceptions may be granted and specific standards relative thereto:"

\* \* \*

"*Off-street parking of motor vehicles in connection with commercial or industrial uses.* In any R-A, R-R, R-90, R-60, R-40, R-30, R-20, R-10 or C-O Zone, on land not reserved for street

or highway purposes, the off-street parking of motor vehicles in connection with commercial or industrial uses upon a finding by the Board that said use will not constitute a nuisance because of traffic, noise or physical activity, provided that the applicable provisions of Section 111-27, particularly subsection D, and the following requirements are complied with:

"1. No charge shall be made for use of such parking facility for the first hour.

"2. No service of any kind shall be extended to persons occupying vehicles in such parking space * * *."

(Sec. 111-27 (d) provides for screening, etc. for off-street parking areas.)

*Sec. 111-35.*

"a. A special exception may be granted when the Board, or the Director, as the case may be, finds from a preponderance of the evidence produced at the hearing that:

"(1) The proposed use does not affect adversely the General Plan for the physical development of the District, as embodied in this Ordinance and in any Master Plan or portion thereof adopted by the Commission; and

"(2) The proposed use will not affect adversely the health and safety of residents or workers in the area and will not be detrimental to the use or development of adjacent properties or the *general neighborhood*;

"(3) The standards set forth for each particular use for which a special exception may be granted have been met.

"b. The applicant for a special exception shall have the burden of proof, which shall include the burden of going forward with the evidence and the burden of persuasion on all questions of fact which are to be determined by the board or the director."

In construing substantially the same provisions of the Montgomery County Code set forth in the ordinance effective January 1, 1954, in *Robertson v. County Board of Appeals for Montgomery County*, 210 Md. 190, 198, 122 A. 2d 751, 755, Judge (now Chief Judge) Hammond for the Court stated:

> "The ordinance requires an applicant, by a preponderance of the evidence produced at the hearing, to persuade the Board of the specific presence of each of the three prerequisites it imposes."

This Court held in the *Robertson* case that a finding by the Board that there would be no adverse effect upon either the general plan of the District, the use or development of the neighboring properties, or upon the health and safety of the residents or workers in the neighborhood, did not include or necessarily require a finding that no nuisance in the legal sense would be created from the operations of the off-street parking facilities.

In the instant case, the applicants do not dispute that the applicable law places the burden upon them to establish the statutory requirements by a preponderance of the evidence. They earnestly urge upon us that the evidence offered at the hearing clearly meets the burden imposed upon them and that there was no legally sufficient evidence to support or justify a denial of the Special Exception and Variance applied for. Thus, it is alleged that the matter before the Board was not fairly debatable and hence its action was arbitrary, unreasonable and capricious and, therefore, unlawful and void. We do not agree with this contention.

It is quite true as the applicants state that their testimony before the Board consisted of *expert* witnesses— including a traffic expert — whose testimony indicated that the proposed use would not adversely affect the General Plan, would not adversely affect the health and safety of the residents and workers in the area, would not be detrimental to the use or development of adjacent

properties or the general neighborhood and would not create a traffic nuisance. On the other hand, the protestants presented substantial evidence of witnesses, who live in the neighborhood and who have personally observed the traffic conditions on Westbard Avenue at the location of the subject property, indicating that the granting of the application would create a serious traffic hazard in the area and would create additional traffic hazards at the junior high school across the street from the subject property. Several witnesses for the protestants testified that there were severe traffic jams and congestion during the morning rush hour in this vicinity. There was also testimony that many of the children who attend the junior high school are driven to school, let out of automobiles across the street from the parking lot and have to cross the street to enter the school grounds at the pedestrian entrance across from the subject property. Several parents of children attending the junior high school testified that traffic in the late afternoon was so heavy that they thought it was dangerous to pick up their children at the school and had arranged to pick them up at the nearby Little Falls Library. Witnesses for the protestants also testified that they had observed several accidents immediately across the street from the subject property, and one witness stated that she had seen some 30 to 40 automobiles parked in the area waiting for students to come out from the junior high school. One witness was much alarmed when she observed from her porch that her son had to jump back to avoid being hit. She "had been very disturbed about the traffic here ever since. This is a hill, a very steep hill." There is no sidewalk on the east side of Westbard Avenue so that those who would use the proposed parking area could not "walk up a sidewalk along that side." Several of the property owners who testified indicated that the granting of the applications would depreciate the value of their properties.

The traffic expert who testified for the applicants had obtained his education in the Netherlands, was a regis-

tered traffic engineer in that Country and was a member
of the Traffic Department of the Royal Dutch Institute
of Engineering, having a Masters Degree in Traffic En-
gineering. His traffic report in the present case was his
second traffic report in the United States. He admitted
on cross-examination that in preparing his report he had
used data assembled by Montgomery County officials the
preceding autumn with current signal timing figures, but
he did not know whether or not there had been any
change in signal timing since the preceding autumn. He
also admitted that he had not observed the traffic condi-
tions at the junior high school "in the morning peak
hour," nor did he know that traffic was not permitted to
turn left from Massachusetts Avenue on to Little Falls
Parkway between September 1967 and January 1968 so
that the traffic pattern had changed in that no left turns
were permitted during commuting hours.

The applicants' traffic expert was of the opinion that
there was no congestion on Westbard Avenue inasmuch
as the traffic was at a "tolerable" level, which he stated
was when drivers would have to wait for three to seven
red lights. He also was of the opinion that the proposed
parking lot limited to the use of the NIH employees "gen-
erates traffic but no new traffic." The protestants pointed
out, however, that Finding No. 2 in the traffic expert's
report stated:

> "2. Parking spaces presently used by the 279
> NIH employees elsewhere in the area will be-
> come *available to other users* after construction
> of the proposed parking facility."
> (Emphasis supplied.)

The Board in denying the Special Exception and dis-
missing the application for the Variance as moot, stated
in part:

> "The Board finds that the use of the subject
> property for parking lot purposes as proposed
> would result in a potentially hazardous situation

with respect to children attending Western Suburban Junior High School. The hours of maximum use of the parking lot would be at approximately 8:30 A.M. and 5:00 P.M. on weekdays, which almost coincides with the times of arrival and departure of students attending the school, considering after school hour activities. Although the vehicular access to the school is via Massachusetts Avenue, many students arriving by automobile and on foot use the pedestrian access on Westbard Avenue, directly across the street from the subject property.

"The Board finds that the proposed use would not only result in a shift in traffic flow to the area in the vicinity of the school, but also that the freeing of spaces now occupied by vehicles of employees in the Westwood Building would generate additional traffic in the entire area. Consequently, there would be 'created a traffic nuisance resulting in an adverse effect upon the health and safety of persons in the area.' "

The applicants make much of the statement of the Board that the proposed use "would result in a *potentially* hazardous situation with respect to children" (emphasis supplied) attending the junior high school, and argue that our decision in *Furnace Branch Land Co. v. Board of County Comm'rs of Anne Arundel County*, 232 Md. 536, 541, 194 A. 2d 640, 642-643 (1963), and prior cases therein cited, require a finding of a *real* problem and not a *potential* problem. In our opinion, however, a reading of the Board's resolution as a whole indicates that the Board found that the traffic hazard was a present one, not only to the children using the school, but also to the entire area. There was evidence to support its finding that the proposed use "would not only result in a shift in traffic flow to the area in the vicinity of the school, but also that the freeing of spaces now occupied by vehicles of employees in the Westwood Building would generate

additional traffic in the entire area" and that there would be "created a traffic nuisance resulting in an adverse effect upon the health and safety of the persons in the area." The issue was "fairly debatable" and we will not substitute our judgment for that of the Board under these circumstances and hold that the Board's action was arbitrary, unreasonable or capricious. As we stated in *Eger v. Stone,* 253 Md. 533, 542, 253 A. 2d 372, 377 (1969) :

> "We have made it quite clear that if the issue before the administrative body is 'fairly debatable', that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body, in the absence of an unconstitutional taking of private property for public use without the payment of just compensation. (Citing cases.)
> 
> "This rule will be adhered to even if we were of the opinion that the administrative body came to a conclusion we probably would not have reached on the evidence. In the instant case, but for the rule, we might well have reached the conclusion reached by the learned lower court, but in enforcing the rule we are obliged to say that reasonable persons could have reached a different conclusion on the evidence so that the issues were fairly debatable, and hence, the decision of the Board must be sustained."

See also *The Richmond Corporation v. Board of County Commissioners for Prince George's County,* 254 Md. 244, 265, 255 A. 2d 398, 408-409 (1969).

The applicants rely upon our decision in *Montgomery County v. Merlands Club, Inc.,* 202 Md. 279, 96 A. 2d 261 (1953) and prior cases therein mentioned, indicating that it is arbitrary, unreasonable and capricious for the Board to make an essential finding without substantial supporting evidence. This general principle is, of course,

correct, but, as we have already stated, there *was* substantial supporting evidence in the present case to sustain the findings of the Board. In the *Merlands Club* case, the Board had proceeded upon an incorrect legal premise that the application in that case was for a "commercial venture." That premise was based upon no facts whatever in the record and stood in the face of the record in which all of the evidence indicated that there would be no injury to neighboring properties and the general neighborhood from the proposed private club.

The applicants also urge that some of the evidence produced by the protestants was "hearsay" and not entitled to weight in overcoming the opinion and testimony of their traffic expert, but as we stated in *Eger v. Stone, supra*:

> "We have recently decided, however, that not only is hearsay evidence admissible in administrative hearings in contested cases but that such evidence, if credible and of sufficient probative force, may indeed be the sole basis for the decision of the administrative body. *Neuman v. Mayor and City Council of Baltimore*, 251 Md. 92, 246 A. 2d 583 (1968) * * *"
> (253 Md. at 542, 253 A. 2d at 377).

*Order affirmed, the appellants to pay the costs.*